

**U.S. Department of Justice**

*United States Attorney
District of Maryland
Southern Division*

| | | |
|---|---|---|
| Rod J. Rosenstein<br>United States Attorney<br><br>Solette A. Magnelli<br>Assistant United States Attorney | 400 United States Courthouse<br>6500 Cherrywood Lane<br>Greenbelt, MD 20770-1249 | DIRECT: 301-344-4124<br>MAIN: 301-344-4433<br>FAX: 301-344-4516<br>TTY/TDD: 301-344-2426<br>Solette.Magnelli@usdoj.gov |

December 7, 2009

Alan Bussard, Esquire
405 Alleghany Avenue
Towson, MD 21204

    Re:    United States v. Robert Harris, JFM-09-0512

Mr. Bussard:

       This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by December 16, 2009, it will be deemed withdrawn. The terms of the agreement are as follows:

### Offense of Conviction

       1.    The Defendant agrees to plead guilty to Counts One through Four and Count Seven of the Indictment now pending against him, which charges him with Conspiracy Related to Interstate Prostitution, in violation of 18 U.S.C. § 371 (Count One); Interstate Transportation for Prostitution (Mann Act), in violation of 18 U.S.C. § 2421 (Count Two); Enticement, in violation of 18 U.S.C. § 2422(a)(Count Three); Sex Trafficking by Force, Fraud and Coercion, in violation of 18 U.S.C. § 1591(Count Four); and Conspiracy to Distribute and Possess with Intent to Controlled Dangerous Substances (Count Seven), in violation of 21 U.S.C. § 846. The Defendant admits that he is, in fact, guilty of these offenses and will so advise the Court.

### Elements of the Offense

       2.    The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

Revised 11/5/09                    1

### Count One: Conspiracy Related to Interstate Prostitution

      a.    That a conspiracy between two or more persons to transport any individual with intent that such individuals engage in prostitution as charged in the Indictment existed,

      b.    That a conspiracy between two or more persons to persuade, induce, entice and coerce any individual to travel in interstate commerce to engage in prostitution as charged in the Indictment existed,

      c.    That the defendant knowingly and intentionally became a member of that conspiracy, and

      d.    That one or more of co-conspirators did any act to effect the object of the conspiracy.

### Count Two: Interstate Transportation for Prostitution

      a.    The defendant did knowingly and intentionally,
      b.    Transport individuals in interstate and foreign commerce,
      c.    With the intent that such individuals engage in prostitution.

### Count Three: Enticement

      a.    The defendant did knowingly,
      b.    Persuade, induce, entice and coerce an individual,
      c.    To travel in interstate and foreign commerce to engage in prostitution.

### Count Four: Sex Trafficking by Force, Fraud and Coercion

      a.    The defendant knowingly,

      b.    In and affecting interstate and foreign commerce,

      c.    Recruited, enticed, harbored, transported, provided and obtained by any means an individual,

      d.    Benefitted financially and received anything of value from participation in a venture engaged in such acts, and

      e.    Knowing or in reckless disregard of the fact that force, fraud and coercion would be used to cause said individual to engage in a commercial sex act.

### Count Seven: Narcotics Conspiracy

      a.    At or about the time charged in the Indictment, the Defendant knowingly, intentionally and willfully agreed with one or more persons to distribute or possess with the intent to distribute, the types and quantities of the drugs set forth in the Indictment, and

      b.    That the defendant knowingly and intentionally became a member of that conspiracy.

## Penalties

3. The maximum sentence provided by statute for the offenses to which the Defendant is pleading guilty is as follows:

   a. Count One: a maximum term of 5 years, $250,000 fine, and a maximum term of supervised release of 3 years.

   b. Count Two: a maximum term of 10 years, $250,000 fine, a maximum term of supervised release for life and a mandatory minimum term of supervised release of five years pursuant to 18 U.S.C. § 3583(k).

   c. Count Three: a maximum term of 20 years, $250,000 fine, a maximum term of supervised release for life and a mandatory minimum term of supervised release of five years pursuant to 18 U.S.C. § 3583(k).

   d. Count Four: a maximum term of life imprisonment and a mandatory minimum sentence of fifteen (15) years pursuant to 18 U.S.C. § 1591(b)(1), $250,000, a maximum term of supervised release for life and a mandatory minimum term of supervised release of five years pursuant to 18 U.S.C. § 3583(k).

   e. Count Seven: a maximum term of 20 years, $1,000,000 fine, a maximum term of supervised release for five years and a mandatory minimum term of supervised release of three years pursuant to 21 U.S.C. § 841(b)(1)(C).

4. In addition, the Defendant must pay $500.00 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court must also order restitution, if restitution is warranted, pursuant to 18 U.S.C. §§ 1593(a), 3663, 3663A, and 3664. If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

5. The Defendant understands and agrees that as a consequence of his conviction for the crimes to which he is pleading guilty, he will be required to register as a sex offender in the place where he resides, where he is an employee, and where he is a student, pursuant to the Sex Offender Registration and Notification Act (SORNA), and the laws of the state of his residence. Failure to do so may subject him to new charges pursuant to 18 U.S.C. § 2250.

## Waiver of Rights

6. The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

    a. If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

    c. If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

    d. The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

    e. If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed that would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    f. By pleading guilty, the Defendant will be giving up all of these rights, including all rights to additional discovery, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

    g. If the Court accepts the Defendant's plea of guilty, there will be no further

trial or proceeding of any kind, and the Court will find him guilty.

Advisory Sentencing Guidelines Apply

      7.      The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

Factual and Advisory Guidelines Stipulation

      8.      This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto, which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

         a.      Count One groups with Counts Two and Three (Group One).

         b.      Counts Two and Three: Mann Act and Enticement

              i.      The base offense level is 14. U.S.S.G. § 2G1.1(a)(2).
              ii.      The defendant was a manager or supervisor and the criminal activity involved five or more participants or was otherwise extensive, resulting in an increase of three (3) levels. U.S.S.G. § 3B1.1(b).
              iii.      Thus, the adjusted offense level is 17.

         c.      Count Four: Sex Trafficking by Force, Fraud or Coercion (Group Two)

              i.      The offense involved sex trafficking of an individual other than a minor, resulting in a base offense level of 34. U.S.S.G. § 2G1.1(a)(1).
              iii.      The defendant willfully obstructed or attempted to obstruct or impede the administration of justice with respect to the investigation and prosecution of the instant offenses of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct, resulting in an increase of two (2) levels. U.S.S.G. § 3C1.1.
              iv.      Thus, the adjusted offense level is 36.

         d.      Count Seven: Narcotics Conspiracy (Group Three)

              i.      N-Benzylpiperazine, also known as BZP, has a stimulant effect on the central nervous system that is substantially similar to the stimulant effect on the central

nervous system of 3, 4-methylenedioxymethamphetamine. U.S.S.G. § 2D1.1, App. Note 5(B); and

    ii.    the applicable base offense level is a level 26, pursuant to U.S.S.G. § 2D1.1(c)(7), to account for at least 50 grams but less than 200 grams of methamphetamine.

    iii.    The offense also involved the possession of a firearm, resulting in an increase of two (2) levels. U.S.S.G. § 2D1.1(b)(1).

    iv.    Thus, the adjusted offense level is 28.

    e.    There are three groups as determined above. Chapter Three, Part D, of the Sentencing Guidelines instructs to count as one Unit the Group with the highest offense level which, in this case, is 36 (Group Two). Groups One and Three are more than 9 levels less serious than Group Two, so the offense level is not adjusted further. Thus, the combined offense level is determined by taking the offense level applicable to the Group with the highest offense level without increasing that offense level. U.S.S.G. § 3D1.4. Accordingly, the combined offense level, before any reduction for acceptance of responsibility, is 36.

    f.    This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty. This Office may oppose any adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

    h.    Thus, the final offense level is 33.

9.    The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

### Obligations of the United States Attorney's Office

10.    This Office and the Defendant agree that with respect to the calculation of criminal history and the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute. The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to

consider, factors under 18 U.S.C. § 3553a.

### Forfeiture

11. The defendant understands that the court will, upon acceptance of his guilty plea, enter an order of forfeiture as part of his sentence, and that the order of forfeiture may include assets directly traceable to his offense, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense. Specifically, the court will order the forfeiture of all property involved in the offenses, including but not limited to the following: one 9 mm Hi Point Luger handgun, serial number P1350262, and .380 caliber ammunition. The defendant agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

### Assisting the Government with Regard to the Forfeiture

12. The defendant agrees to assist fully in the forfeiture of the foregoing assets. The defendant agrees to disclose all of his assets and sources of income to the United States, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including but not limited to executing any and all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are not sold, disbursed, wasted, hidden or otherwise made unavailable for forfeiture. The defendant further agrees that he will not assist any third party in asserting a claim to the forfeited assets in an ancillary proceeding and that he will testify truthfully in any such proceeding.

### Waiver of Further Review of Forfeiture

13. The defendant further agrees to waive all constitutional, legal and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The defendant also agrees not to challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this agreement, and will not assist any third party with regard to such challenge or review or with regard to the filing of a petition for remission of forfeiture.

### Waiver of Appeal

14. In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

      a.    The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction;

      b.    The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), <u>except</u> that this Office reserves the right to appeal any term of imprisonment to the extent that it is below the mandatory minimum sentence of 15 years on Count Four of the Indictment.

      c.    Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

      d.    The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

<u>Obstruction or Other Violations of Law</u>

15.    The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement that would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

<u>Court Not a Party</u>

16.    The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of

Revised 11/5/09                           8

the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

<u>Entire Agreement</u>

17.     This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Respectfully,

Rod J. Rosenstein
United States Attorney

By: _____
Solette Magnelli
Assistant United States Attorney

I have read this agreement, including the Sealed Supplement, and have carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

12-16-09                                  _____
Date                                      Robert Harris

I am Robert Harris' attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement with him. He advises me that he understands and accepts its

terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

_____12/14/09_____   _____
Date                    Alan Bussard, Esquire

## ATTACHMENT A

**The defendant stipulates and agrees that if this case had proceeded to trial, the government would have proven the following facts beyond a reasonable doubt. The defendant also stipulates and agrees that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.**

**ROBERT HARRIS** a/k/a "Little Rob," age 21, is resident of Chillicothe, Ohio. At all times relevant, **HARRIS** was unemployed and earned his income from dealing drugs and managing prostitutes. **HARRIS** also illegally owned a 9 mm Hi Point Luger firearm.

As will be described in detail below, from at least January 2009 through September 2009, **HARRIS** did knowingly and willfully conspire with Craig COREY, Richard JOHNSON, Jacob TYLER, and others, to distribute and possess with intent to distribute at least 50 grams but less than 200 grams of a quantity of a mixture or substance containing a detectable amount of 3,4-Methylenedioxymethamphetamine (MDMA), also known as Ecstasy, a Schedule I controlled substance, and N-Benzylpiperazine, also known as BZP, a Schedule I controlled substance. **HARRIS** also knowingly and willfully conspired with COREY, JOHNSON, TYLER, and others, from at least January 2009 through April 2009, to transport individuals in interstate commerce with the intent that such individuals engage in prostitution, and to persuade, induce, entice and coerce individuals to travel in interstate commerce to engage in prostitution. Moreover, at some time between March and April 2009, **HARRIS**, COREY and JOHNSON, did knowingly, in and affecting interstate commerce, recruit, entice, harbor, transport, provide a female referred to herein as "Jane Doe 1," benefitted financially from participation in said acts, and knowing that force, fraud and coercion would be used to cause "Jane Doe 1" to engage in said acts.

In early 2009, **HARRIS** learned from COREY, TYLER and JOHNSON that COREY made frequent trips back to Ohio from his Army assignment in Maryland. TYLER and COREY stated that COREY maintained an apartment in Maryland out of which COREY operated a house of prostitution. The prostitutes who worked at COREY's apartment were advertised on Craigslist, with said postings being paid by pre-paid debit cards purchased from a local Maryland Wal-Mart and CVS. The prostitutes, TYLER and COREY would split the prostitution earnings, which COREY and TYLER stated were significant. **HARRIS** also learned that COREY purchased Ecstasy from a drug dealer in Detroit, Michigan with whom COREY became acquainted through another soldier. These, and other drugs, were distributed to numerous individuals, including to females to assist in motivating them to prostitute for the defendants. Consequently, **HARRIS** also purchased Ecstasy and BZP from COREY's Michigan connection, and was asked to participate in buying Oxycontin from a relative to COREY. **HARRIS** paid for these narcotics from his own drug sales of Percoset, Cocaine, Crack Cocaine, Ecstasy and Heroin, which he normally obtained from numerous sources, including COREY's Michigan connection and JOHNSON.

During the relevant time period, **HARRIS** and his co-conspirators transported, and enticed to travel, at least 12 individuals from at least two different states to Maryland. The females who

1

were brought to Maryland did not have independent forms of transportation or finances, and relied exclusively on the defendants for their well-being. JOHNSON, **HARRIS** and TYLER shared in the prostitution earnings of girls who worked directly for them. COREY, however, received a portion of all the prostitution earnings, including from Jane Doe 1, which could range in the thousands of dollars per week. COREY spent his earnings on illegal narcotics, electronics, clothes, car accessories and other items symbolizing wealth. **HARRIS** spent his earnings on illegal narcotics and items symbolizing wealth, such as jewelry, clothes and gold teeth.

To further their unlawful activities, **HARRIS** and his co-conspirators:
 a. used Craigslist, MySpace, YouTube, other web-based social networking and classified advertising services, as well as cellular telephones, to recruit females to serve as prostitutes, to promote their prostitution business, and to advertise sexual services;
 b. used prepaid debit cards and aliases when posting Craigslist ads for sexual services in order to conceal their unlawful activities;
 c. assisted in photographing females in various states of undress to accompany advertisements of sexual services on Craigslist;
 d. traveled from destinations within and outside of Maryland, including Ohio and New York, to facilitate the prostitution business in Maryland; and
 e. collected and shared the cash proceeds of the prostitution business, used a portion of the prostitution proceeds to purchase illegal narcotics, and distributed illegal narcotics to associates, prostitutes, sex and drug customers, and others both inside and outside of Maryland.

From approximately February 2009 to April 16, 2009, **HARRIS** was almost exclusively living at COREY's Millersville, Maryland apartment. **HARRIS** convinced Jane Doe 1 to travel from Ohio to Maryland to prostitute, transported Jane Doe 1 to Maryland, and helped manage Jane Doe 1 in Maryland. Once at COREY's apartment, COREY photographed Jane Doe 1 unclothed as well as partially clothed and provided her an alias. Both these photos and the alias were utilized in the Craigslist ads that offered Jane Doe 1 for commercial sex acts. The ads also featured various pricing level, which COREY established. The advertised 202 phone number for sex customers to call and make a date with Jane Doe 1 belonged to COREY, however, **HARRIS** also provided his cellular telephone number in several ads for this purpose as well.

When **HARRIS** traveled to Maryland from Ohio, he also brought an illegally obtained 9 mm Luger handgun with .380 ammunition; all the occupants of COREY's apartment knew that **HARRIS** possessed the firearm. **HARRIS** understood that part of his role with regard to managing the brothel might entail confronting and threatening sex customers, and that this could be accomplished by brandishing his firearm. At some point between approximately February and April 2009, TYLER did, in fact, brandish **HARRIS'** firearm at a sex customer when a dispute over payment arose. TYLER also discussed shooting one of the females with the firearm.

Beyond the threat and presence of firearms, threats and actual physical violence were utilized against female sex workers. On one occasion, **HARRIS**, COREY and several of the females observed TYLER beating a female sex worker when she refused to continue prostituting; neither

2

COREY nor **HARRIS** intervened. TYLER also sabotaged this same female's vehicle so that she was unable to leave the Millersville apartment. On a different occasion, **HARRIS** physically assaulted Jane Doe 1 when she refused to share her prostitution earnings. **HARRIS** also subsequently and repeatedly threatened Jane Doe 1 over the sharing of her earnings.

During **HARRIS'** stay at COREY's Maryland apartment, **HARRIS** assisted the brothel operation in numerous additional ways. **HARRIS** accompanied COREY and the females when the female was hired to do an "out call," or to visit a date at a destination outside of the Millersville apartment. **HARRIS** would also accompany COREY to the Greyhound bus station to pick up female prostitutes who had traveled from New York to Maryland to work out of COREY's apartment. **HARRIS** also assisted in obtaining pre-paid debit cards to pay for prostitution ads on Craigslist.

**HARRIS**, JOHNSON and TYLER also acted as managers while COREY was at work during the day. Nevertheless, COREY established the brothel operations and received portions of all its earnings. COREY would often return from work at lunch to collect whatever prostitution earnings had been earned. COREY also paid for a cellular telephone whose 202 number was primarily dedicated to sex customers calling from the Craigslist ads. When COREY took the 202 phone to work and elsewhere, COREY would field phone calls from potential sex customers and relay the information back to the occupants of his apartment so the business could continue operating though he was physically absent.

In addition, JOHNSON, COREY, **HARRIS** and TYLER distributed numerous illegal narcotics to the prostitutes and other females in Maryland, including Marijuana, Xanax, Percoset, Ecstasy and BZP. Some females would travel to Maryland from Ohio but would not engage in prostitution. Instead, they would assist the business by posting ads, collecting prostitution proceeds, and maintaining the apartment. One such female was COREY's girlfriend, who assisted by answering the phone number reserved for sex customers, collecting money left by the sex customers, and posting sex ads.

On at least one occasion, **HARRIS** went to Detroit, Michigan with COREY to purchase illegal narcotics. **HARRIS** and COREY traveled from Baltimore, Maryland to Detroit, Michigan in COREY's Chrysler 300 vehicle. While in Detroit, **HARRIS** and COREY purchased and split approximately 200 Ecstasy and/or BZP pills. COREY and **HARRIS** later distributed these drugs in Ohio and Maryland. **HARRIS** and COREY continued to discuss possible drug distribution until **HARRIS'** incarceration in September 2009.

Upon his federal incarceration in September 2009, **HARRIS** contacted and attempted to contact numerous potential witnesses, including Jane Doe 1, directly and through third parties in

3

order to influence these witnesses to change their statements in order to exculpate **HARRIS**.

_____12-16-09_____   _____/s/ Robert Harris_____
Date                              Robert Harris

_____12/14/09_____   _____/s/ Alan Bussard_____
Date                              Alan Bussard, Esquire

4